**\*Not For Publication**

## United States District Court
## District of New Jersey

_____

|   |   |
|---|---|
| | : |
| | : |
| | : |
| | :   Civil Action No.: 09-314(FLW) |
| IN RE: | : |
| | : |
| LORI BUCCOLO, | : |
| | :   **OPINION** |
| | : |
| | : |
| Debtor. | : |
| | : |

_____

**WOLFSON, United States District Judge:**

Lori Buccolo ("Debtor" or "Ms. Buccolo") appeals from the final decision of the United States Bankruptcy Court for the District of New Jersey, denying Debtor's motion to re-convert her case from Chapter 7 to Chapter 13 under 11 U.S.C.S. § 706(a). The main issue in this appeal is whether the Bankruptcy Court erred when it denied Ms. Buccolo's motion to convert her case. Upon reviewing the Bankruptcy Court's decision, this Court finds that the Bankruptcy Court did not err in finding that Debtor's proposed Chapter 13 plan is not feasible and not proposed in good faith. Thus, the final decision of the Bankruptcy Court is **AFFIRMED**.

### FACT AND PROCEDURAL HISTORY

The record before the Bankruptcy Court and this Court's prior rulings reveal the following:

## I.       Chapter 13

This bankruptcy case commenced as a Chapter 13 proceeding on June 24, 2005, after Ms. Buccolo had separated from her husband Bruce Buccolo ("Mr. Buccolo") and filed for divorce. Although title to the home was solely in her maiden name of Lori A. La Pira, Ms. Buccolo moved out of the marital home while Mr. Buccolo remained. Both parties had contributed to the purchase of the property, and there was an unrecorded written agreement that each owns a fifty percent interest in the property.

The initial Chapter 13 plan entailed a $100 minimum payment per month to the Chapter 13 Trustee and sale of the home within twelve months. This plan ensured that all creditors would be paid in full since Debtor estimated the residence value at $850,000, secured claims at less than $400,000, and unsecured claims at less than $150,000. While Ms. Buccolo hired a realtor to market her property, she filed an Adversary Complaint against her husband alleging that: (1) he refused to cooperate in the sale of the residence, (2) was not paying the mortgage or other expenses, and (3) was thwarting her sale efforts. In a certification filed in the adversary proceeding, Ms. Buccolo stated:

> All of my debts resulted from Bruce and his various business dealings. I would not be in this Chapter 13 bankruptcy but for Bruce. He failed to pay various debts he incurred in my name, resulting in judgments against me. In addition to creating all this debt in my name, he has destroyed my credit completely.
>
> This "approval letter"[1] fails to take into account Bruce's poor credit history, as well as the long line of judgments against him. I am aware of Bruce's inability to secure financing, as this was one of the reasons that the property was purchased solely in my name. This letter is no guarantee that Bruce has the ability to secure financing to secure an independent mortgage on the property, and given my knowledge of Bruce's finances, I am extremely doubtful that Bruce could secure adequate financing to secure a loan of $450,000.

---

[1] Referring to a loan proposal Mr. Buccolo had presented to the court

Ms. Buccolo requested to have her husband removed from the property or to cooperate with the sale. The Bankruptcy Court allowed Mr. Buccolo to remain in the home until it was sold, conditioned on him paying all post-petition costs, which included the mortgage and complying with the sale.

A year after the initiation of the bankruptcy proceeding, Ms. Buccolo had not contracted with any potential buyer for the sale of her home. However, Ms. Buccolo continued to claim that Mr. Buccolo was disrupting the marketing, and in turn, the sale of the property. Mr. Buccolo responded to these allegations with a motion to convert the Chapter 13 bankruptcy proceeding to Chapter 7, which would allow him to place an offer on the house with the Chapter 7 Trustee. At the same time, Countrywide, the mortgage company, filed a motion for relief from the automatic stay claiming that several monthly post-petition mortgage payments had not been made, which was in violation of the conditions placed on Mr. Buccolo that allowed him to live in the residence. Ms. Buccolo agreed with Countrywide, claiming that he had failed to pay the mortgage for seven months.

## II.     Conversion to Chapter 7

On June 14, 2006, the Bankruptcy Court converted Ms. Buccolo's case to Chapter 7 and appointed Thomas Orr as the Trustee. Mainly, the Trustee was appointed after it appeared that the animosity between Mr. and Ms. Buccolo was adversely impacting the parties in Ms. Buccolo's bankruptcy proceeding.

The Trustee continued marketing the home without success, claiming that Mr. Buccolo was interfering with his realtor's marketing efforts. Subsequently, the Trustee filed an adversary complaint to remove Mr. Buccolo from the residence. Mr. Buccolo disputed the allegations against him, and moved to compel the Trustee to sell the

residence to him for $500,000, a sufficient amount to satisfy all creditors. However, Ms. Buccolo objected to the $500,000, claiming that it was substantially below market value of $850,000. She expected the market value would provide a surplus after paying all creditors, subject to equitable distribution in the matrimonial action in state court.

The Bankruptcy Court granted the Trustee's request and ordered Mr. Buccolo to vacate the residence by March 31, 2007, and his cross motion for a sale of the house was denied. While he appealed to the district court ("First Appeal"), the bankruptcy court denied his request for a stay pending appeal. The district court orally granted a temporary stay pending appeal on March 19, 2007, "to preserve the status until briefing on the stay motion is complete." At this time, Ms. Buccolo and her husband reconciled; Debtor's attempt to sell the residence in bankruptcy had not succeeded and in March 2007, Ms. Buccolo decided to move back into the house for the sake of her son, simultaneously withdrawing her divorce complaint.

After Mr. Buccolo failed to answer the complaint in Bankruptcy Court, a default judgment was entered, thereby making the injunction permanent. He then filed a motion to vacate the default judgment, which was denied because he did not present a meritorious defense. Thereafter, Mr. Buccolo appealed to the district court for the second time ("Second Appeal"). However, on July 20, 2007, the district court vacated the temporary stay of his eviction and ordered him to show cause why his appeal should not be dismissed for lack of prosecution after failing to provide the transcript of the Bankruptcy Court's proceeding. The district court gave Mr. Buccolo another chance to file a brief by September 7, 2007. Once again failing to meet the deadline, the district court dismissed the First Appeal on October 23, 2007, finding that Mr. Buccolo's reasons for delay lacked merit. His motion for reconsideration was denied by the district court on

4

December 19, 2007, and the court also dismissed the Second Appeal, citing failure to prosecute and lack of merit.

On April 7, 2008, the Third Circuit denied his emergent motion to stay eviction, stating that Mr. Buccolo did not show a "likelihood of success on the merits of his petition." Mr. Buccolo then filed a motion to proceed in forma pauperis – it was granted on June 3, 2008. At the time, he claimed he had $248 (in cash) in his possession and no other valuable assets.

The Trustee continued to pursue Mr. Buccolo's eviction in light of the fact that there was no stay pending appeal. While the Trustee renewed his efforts to have Mr. Buccolo removed, Debtor reversed her position, thereby opposing the sale of the residence. In turn, the Trustee moved to have Ms. Buccolo removed as well; however, she appealed to the district court. As the Bankruptcy Court denied her motion for a stay pending appeal, the district court dismissed her appeal for failure to file a designation of record. She then filed a motion to re-convert to Chapter 13 on an emergent basis with new counsel, since her bankruptcy counsel withdrew.

The Bankruptcy Court decided that the disputed facts warranted an evidentiary hearing, and preserved the status quo (until the motion could be decided) by entering an order conditioning Debtor's occupancy in the residence on her paying $6000 per month to Countrywide. The Bankruptcy Court decided that $6000 was an appropriate amount since it was slightly less than the amount Ms. Buccolo would have to pay if her motion to convert to Chapter 13 was successful.

The evidentiary hearing allowed Debtor and her husband to testify, along with a mortgage broker, who told the court that if Ms. Buccolo successfully submitted all payments on time under a Chapter 13 plan for twelve months, she would qualify for a

new mortgage that would allow her to pay all claims in full. The Bankruptcy Court decided to reserve judgment while still requiring Ms. Buccolo to pay the $6,000 on the first of each month until a decision had been rendered.

### III.    Mortgage Payments Post Petition

When Debtor requested to have her husband evicted at the initial hearing on November 15, 2005, Mr. Buccolo produced copies of cancelled checks to prove that he had paid the mortgage for the post petition months of July, August and September 2005. In addition, his attorney represented to the Bankruptcy Court that Mr. Buccolo had made his October and November payments of that same year. When Mr. Buccolo was permitted to remain in the residence in January 2006, his occupancy was conditioned on making monthly mortgage payments. However, in June 2006, Countrywide alleged that the mortgage payments were in arrears, while Mr. Buccolo disputed these claims. However, he produced no evidence such as cancelled checks to prove payment. Countrywide withdrew its motion when the Chapter 7 Trustee was appointed.

On January 25, 2007, a hearing was held again regarding the request to remove Mr. Buccolo from the residence. At the hearing, Debtor's attorney obtained information from Countrywide that indicated no mortgage payments had been made since March 2006. Through counsel, Mr. Buccolo denied the allegations and offered to produce cancelled checks; however, he never followed through with his offer to produce evidence. There was an attempt to reconcile the discrepancy between Mr. Buccolo's and Countrywide's claims; the Trustee subpoenaed an account statement for November 2006 from Mr. Buccolo's bank after he produced a bank statement showing a withdrawal in the amount of the mortgage payment on November 30, 2006. After reviewing the bank statement, the Trustee accused Mr. Buccolo of altering his bank statement before

6

presenting it to the court, an allegation that he denied, instead questioning the accuracy of the bank record produced by the Trustee.

On August 14, 2008, at the hearing on Debtor's motion to re-convert her case to Chapter 13, Countrywide introduced a bank statement into evidence that showed around $15,000 in payments since the initiation of the bankruptcy case; however, three years of payments would have actually totaled over $60,000. Without producing any cancelled checks, Mr. Buccolo claimed that he had made seventeen mortgage payments since 2003. However, the Bankruptcy Court found Mr. Buccolo's testimony unreliable; Countrywide claimed that he was severely delinquent, and that, despite numerous chances, he had still failed to produce copies of cancelled checks in order to prove payments beyond September 2005. In addition, he admitted that he paid no more than seventeen payments since 2003, even though he should have paid substantially more. Therefore, the court concluded that the representation on January 25, 2007 that Mr. Buccolo was not behind any of his payments was false. In re Buccolo, 397 B.R. 527, 536 (Bankr. D.N.J. 2008).

When Debtor moved to re-convert, the Bankruptcy Court conditioned her continued occupancy in the residence on her paying $6,000 per month to Countrywide. During this time, she relied on her husband to make the payments (just as if the plan to re-convert was confirmed), and the July 1st payment was delivered on time. However, the next month's payment was not on time; when Countrywide's attorney did not receive the August payment, she contacted Ms. Buccolo's attorney. The attorney then contacted Mr. Buccolo and the payment was delivered, albeit late. The September 1st payment was made on time after the hearing in August, but the October 1st payment was not. Once again, only after Countrywide's attorney contacted Ms. Buccolo's lawyer was the mortgage payment tendered from Mr. Buccolo's company on October 10, 2008.

### IV.    Proposed Chapter 13 Plan - Feasibility

The Debtor's Chapter 13 proposal included payments of $3,500 per month to the Trustee and regular monthly payments of $1,798 in principal and interest on her home mortgage. On amended schedules I and J, Ms. Buccolo disclosed her income along with her husband's income and household expenses. Ms. Buccolo was making $69,000 per year at a pharmaceutical company, and her net take home pay was $3,565 each month. She was willing to have all of her net income sent directly to the Chapter 13 Trustee in order to fund the monthly payments in her plan.

Ms. Buccolo worked a second job at her husband's limo company, which netted her about $1,500 per month; she proposed using the second income along with her husband's income to pay for all of her household expenses, including her mortgage and real estate taxes. Mr. Buccolo operated a limousine service through a corporation owned by Ms. Buccolo and the estate of his deceased father. Along with Ms. Buccolo's income, Mr. Buccolo's estimated annual gross income was recorded on Schedule I at $84,000, with net take home pay at $5,166 a month. The Bankruptcy Court had found that Mr. Buccolo's company had recently repositioned itself in the social market, serving weddings, proms and other social events since its commercial accounts had become less profitable after the terrorist attack on the World Trade Center on September 11, 2001. His business is considered seasonal; in particular, it incurs higher sales in the wedding and prom season and Christmas holidays, and lows early in the year.

In order for the plan to be successful, Mr. Buccolo would have to make enough money to pay $1,798 to Countrywide each month along with real estate taxes and insurance escrow in excess of $1,000 per month. These expenses add up to $3,000 per month, which is in addition to household expenses of approximately $1,800. Schedules I

and J project sufficient net income to cover the aforementioned expenses and plan payments.

Since Ms. Buccolo moved back into her home in March 2007, her and Mr. Buccolo's income has remained the same. This includes her second job at Mr. Buccolo's limo company. Her husband's income tax return recorded over $82,000 in wage income, which should have resulted in net cash available after paying all expenses of $5,000 per month (which includes Debtor's income). The Trustee's counsel brought out in cross examination that if they had not been paying their mortgage and real estate taxes during that time, then they should have had at least $8,000 in excess income each month. However, Ms. Buccolo testified that since moving back to the residence, she did not have $8,000 at the end of any month and could not explain the lack of excess money. Mr. Buccolo offered an explanation, stating that he had accrued large legal fees in connection with both the divorce as well as Ms. Buccolo's bankruptcy case. However, no legal fees had been paid, and the Bankruptcy Court found that there was no credible explanation as to why the Buccolos did not accumulate significant cash in the past eighteen months. The Bankruptcy Court found this particularly disturbing because their income and expenses remained largely the same while they were not paying their mortgage and real estate taxes of approximately $3,000 per month. Indeed, the Bankruptcy Court concluded that the Buccolos income was overstated, and the expenses understated. Buccolo, 397 B.R. at 535. As a result, the Bankruptcy Court denied Ms. Buccolo's motion to re-convert, and this appeal ensued.

**DISCUSSION**

**I.      Standard of Review**

When reviewing a bankruptcy court's decision, the standard of review is determined by the nature of the issues presented on appeal. In particular, factual determinations reviewed on appeal should not be set aside unless found to be "clearly erroneous." In re Continental Airlines, 150 B.R. 334, 336 (D. Del. 1993) (citing Bankruptcy Rule 8013 and In re Morissey, 717 F.2d 100, 104 (3rd Cir. 1983)). A factfinder, rather than a reviewing body, is generally in a better position to make judgments about the reliability of evidence; specifically, the reviewing body only acts pursuant to a written record, while the factfinder is able to evaluate the credibility of a live witness. See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 113 S. Ct. 2264, 2280 (U.S. 1993). In turn, review of facts under the "clearly erroneous" standard is significantly deferential and requires a "definite and firm conviction that a mistake has been committed." Id. Conversely, legal conclusions from the bankruptcy court "are subject to plenary review by the district court and are considered de novo on appeal." Continental, 150 B.R. 334 at 336. Mixed findings of fact and conclusions of law must be broken down, and the applicable standards - "clearly erroneous" or de novo – must be appropriately applied to each component. Meridian Bank v. Alten, 958 F.2d 1226, 1229 (3d Cir. 1992) (citing In re Sharon Steel Corp., 871 F.2d 1217, 1222 (3d Cir. 1989) and Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102-03 (3d Cir. 1981)).

**II.      Debtor's Arguments on Appeal**

Debtor first contends that because the principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor," her motion should be granted. She adds that she is fully qualified and capable of meeting *the means test* for a

Chapter 13 filing, because, among other things, she maintains regular income from long-term employment. In that regard, Debtor maintains that all creditors would be paid in full over time in the same manner as all other Chapter 13 creditors.

Next, Debtor asserts that she has a statutory right to convert from a Chapter 7 to a Chapter 13 bankruptcy proceeding under § 706 of the Bankruptcy Code. Ms. Buccolo claims that because she qualifies as a Chapter 13 debtor, there is a presumption in favor of conversion under subsection 706(c). In addition, Debtor argues that the Bankruptcy Court improperly based a majority of his opinion on the 2005 certification of the debtor, which was filed during the Buccolos' contentious divorce. Since the two parties have reconciled, they have a sincere desire to pay all debts in full and remain in their marital home, facts that Debtor claims the Bankruptcy Court ignored in making his final decision. Debtor continues by stating that all creditors would be fully compensated within twelve months of January 1, 2009. In so doing, Debtor submits that the Bankruptcy Court applied the wrong legal standard: "the best interest of creditors." Rather, Debtor argues the Bankruptcy Court should have applied the correct legal standard: "the benefit of all parties in interest."

Ms. Buccolo also asserts that the Bankruptcy Court applied the wrong legal standard by denying her motion to convert based on the grounds that she would not be able to present a feasible Chapter 13 plan. Debtor argues that feasibility is a requirement for approval of a Chapter 13 plan, but not a requirement or a condition precedent to convert from a Chapter 7 to a Chapter 13 proceeding. Thus, the Bankruptcy Court erred in considering feasibility.

Finally, Debtor contends that the Bankruptcy Court erred in finding a lack of good faith because she was able to comply with the Bankruptcy Court's order that she

pay $6,000 per month in order to remain in her home. Debtor was obligated to submit payments in this amount pending a decision on her motion to re-convert to a Chapter 13 plan. She explains that she made timely payments that totaled $24,000 during the four-month period from July to October 2009 in compliance with the direction of the Bankruptcy Court. The Debtor avers that this conduct demonstrates her good faith in seeking conversion. She also claims that clear, convincing, and objective evidence proves that she was acting in total good faith (i.e. making regular $6,000 monthly payments over four consecutive months, submitting pay stubs for herself and her husband, and presenting copies of their tax returns).

    1.   Legal Right to Conversion: Whether Debtor is Capable of Meeting The Means Test for a Chapter 13 Filing

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") took effect on October 17, 2005, and had a significant impact on 11 U.S.C. § 707(b). Within the new § 707(b), Congress included "a complex burden shifting scheme" and "mandated…that a consumer debtor submit income and expense calculations." Stapleton v. Walker (In re Walker), 381 B.R. 620, 623 (Bankr. M.D. Pa. 2008). Under the new statute, a Chapter 7 consumer debtor provides retrospective income and standard expense information on Form B22A. Id. The aforementioned expense information is calculated from the Internal Revenue Service's national and local standards and is "somewhat hypothetical". Id. (citing In re Spurgeon, 378 B.R. 197, 202 (Bankr. E.D. Tenn. 2007) and In re Hice, 376 B.R. 771, 773 (Bankr. D.S.C. 2007)). "The new income and expense test is commonly known as the means test." Id. (citation omitted).

Relying on this new policy, Debtor claims that the current bankruptcy act, BAPCPA, favors and even mandates Chapter 13 as opposed to Chapter 7 filings for persons who meet the means test. Debtor further claims that she meets the means test; indeed, had her filing taken place on or after October 17, 2005, Chapter 7 would not have been an option for her. However, Debtor's arguments fail on two important grounds: (1) Debtor provides no evidence that she meets the requirements under the BAPCPA, and (2) BAPCPA should not be applied retroactively.

Debtor claims that she has regular income from long-term employment and is fully qualified and capable of meeting the means test for a Chapter 13 filing. This conclusory statement falls short as Debtor provides no analysis to prove she fulfills the statutory requirements of the means test. In addition, Debtor unsuccessfully relies on the BAPCPA, which was enacted on April 20, 2005, but not effective until October 17, 2005[2]. In re Seymoure, 2008 U.S. Dist. LEXIS 32869 (D.N.J. Apr. 21, 2008); see BAPCPA, § 1501(a) (setting the effective date 180 days after the date of enactment). Section 1501(b)(1) states that "otherwise provided in this Act and Paragraph (2), the amendments made by this Act shall not apply with respect to cases commenced under [T]itle 11, United States Code, before the effective date of this Act." BAPCPA, § 1501(b)(1). Fundamentally, the statute must be applied prospectively. Accordingly, Debtor's argument regarding the BAPCPA has no merit.

---

[2] Debtor's case started in Chapter 13 on June 24, 2005.

2. Whether Debtor Has a Statutory Right to Convert from a Chapter 7 to a Chapter 13 Bankruptcy Proceeding

Bankruptcy Code § 706 is the statute governing conversion. More specifically, subsection (a)[3] grants the Debtor an automatic right to convert provided that the bankruptcy proceeding has not previously been converted. Because this action has already been converted from a Chapter 13 to a Chapter 7 proceeding, subsection (a) is inapplicable. Similarly, subsection (b)[4] relates to conversion under Chapter 11. Debtor's case could therefore be analyzed under subsection (c) and (d); section (c)[5] permits the debtor to "request or consent to" a conversion, while section (d) states that "[n]otwithstanding any other provision of this section, a case may not be converted to a case under another Chapter of this title unless the debtor may be a debtor under such Chapter." 11 U.S.C. § § 706(c) and (d).

Debtor asserts that § 706(c) creates a right to a permissive conversion that always existed and is recognized by both the statute as well as case law. Ms. Buccolo supports this claim by citing In re Gary Hollar, 70 B.R. 337 (E.D. Tenn. 1987), for the proposition that a debtor has a right to permissive conversion under subsection 706(c). She also maintains that In re Anderson, 354 B.R. 766 (Bankr. D.S.C. 2006), buttresses the conclusions in In re Gary Hollar, and additionally sets forth the appropriate standard for a motion to convert to a Chapter 13 proceeding:

---

[3] "The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title [11 U.S.C. § 1112, 1208, or 1307]. Any waiver of the right to convert a case under this subsection is unenforceable." 11 U.S.C. § 706(a).

[4] "On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter [11 U.S.C. §§ 701 et seq.] to a case under chapter 11 of this title [11 U.S.C. §§ 1101 et seq.] at any time." 11 U.S.C. § 706(b).

[5] "The court may not convert a case under this chapter to a case under chapter 12 or 13 of this title unless the debtor requests or consents to such conversion." 11 U.S.C. § 706(c).

> The court adopts the view that a previous conversion in a case precludes conversion as a matter of right but that a second conversion may be permitted, after notice and hearing. The court has discretion to order a second conversion but should scrutinize the debtor's circumstances, bona fides, and ability to succeed with the purposes of conversion. The court should weigh the interests of the debtor, the estate and all creditors and address such motion on a case by case basis. The burden of proof is on the moving party.

In re Anderson, 354 B.R. at 769. Based on that language, Ms. Buccolo contends that the Bankruptcy Court erred by only focusing on the interests of the creditors rather than the interests of all the parties.  However, this Court is not persuaded by either argument. Particularly, In re Gary Hollar only speaks generally of a permissive right to convert under § 706 by analyzing the implications of barring permissive conversion, rather than discussing subsection (c). Indeed, that court stated:

> Subsection (a) of this section gives the debtor one absolute right of conversion of a liquidation case to a reorganization or individual repayment plan case. If the case has already once been converted from chapter 11 or 13 to chapter 7, then the debtor does not have that right. The policy of the provision is that the debtor should always be given the opportunity to repay his debts.

In re Gary Hollar, 70 B.R. at 338 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 380, reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6336). Accordingly, Debtor's argument that In re Gary Hollar confirms that subsection (c) contains a language regarding permissive conversion lacks merit.

Similarly, In re Anderson is inapposite; in fact, this case is damaging to Ms. Buccolo's analysis. The court in Anderson denied the debtor's motion to re-convert, holding that under § 706(d), the debtor's burden of proving that she is eligible to be a debtor under Chapter 13 was not met.[6] In re Anderson, 354 B.R. at 769. Therefore, §

---

[6] Moreover, COLLIER ON BANKRUPTCY, ¶706.04 provides that "the court may not convert a Chapter 7 case to a Chapter 12 or 13 case unless the debtor requests the conversion or consents to the conversion." Therefore, subsection (c) limits the number of people who can request conversion to Chapter 12 or 13.

706(c) prohibits the Court from unilaterally converting a case to one under Chapter 13 without the Debtor's motion or consent, while subsection (d) provides the possible means for Debtor to re-convert. Debtor's analysis of subsection (c) therefore fails on this appeal.

Debtor also insists that the Bankruptcy Court solely considered the best interest of the creditors and failed to consider the appropriate standard of "the benefit of all parties in interest." She claims that the Bankruptcy Court failed to evaluate the welfare of Debtor and her family, but instead solely considered the best interest of the creditors. However, the Bankruptcy Court appropriately assessed Debtor's interest, stating that while "[i]t is admirable that the Debtor is willing to devote her entire net income to the plan via a wage order," this plan would leave "none of the Debtor's own income for her family and her life expenses." Buccolo, 397 B.R. at 535. In doing so, the Bankruptcy Court properly assessed Ms. Buccolo's interests, in particular her well-being and that of her family under the proposed Chapter 13 plan.

3. Whether the Bankruptcy Court Applied the Wrong Legal Standard by Assessing Feasibility

Debtor alleges that feasibility is a requirement for approval of a Chapter 13 plan, but is not a requirement or condition precedent to convert from a Chapter 7 to a Chapter 13 proceeding. She substantiates this claim with the statutory language in § 706, the controlling and operative statute dealing with conversions, which does not have plan feasibility as a requirement or a condition for relief. In fact, Debtor asserts that plan feasibility is an issue that only presents itself after a case has been converted to a Chapter

---

COLLIER ON BANKRUPTCY, ¶706.04 ("Section 706(c) serves simply to limit who may request conversion to Chapter 12 or Chapter 13, permitting only the debtor to make such a request"). Subsection (c) does not create any right of conversion; rather, it imposes additional limitations upon otherwise permissible conversions. See In re Baker, 289 B.R. 764, 767 (Bankr. M.D. Ala. 2003). In fact, "[s]ubsection (c) makes clear what is otherwise implicit in subsection (b), which is that only a debtor may convert to either Chapter 12 or Chapter 13." Id.

13 proceeding, and in turn, the Bankruptcy Court should not have assessed feasibility. She erroneously points to <u>In re Masterson</u>, 141 B.R. 84 (Bankr. E.D. Pa. 1992), which suggests that courts are and should be very liberal when judging plan feasibility. Debtor also cites <u>In re Anderson</u> for the very same proposition.

Debtor's argument regarding plan feasibility is flawed and therefore fails on this appeal. Section 706(d) allows Debtor to re-convert to a Chapter 13 case. A recent Supreme Court decision holds that an analysis of §§ 109(e) and 1307(c) of the Bankruptcy Code must occur when confronted with an application of § 706(d). <u>Marrama v. Citizens Bank of Massachusetts</u>, 549 U.S. 365, 372-73 (2007). Section 109(e)[7] describes the parameters for a debtor to qualify as a debtor under Chapter 13. Section 1307(c)(5)[8] provides that cause exists to dismiss a Chapter 13 case for "denial of confirmation of a plan under section 1325 of this title [. . . ]." 11 U.S.C. § 1307(c)(5). In turn, section 1325 of the Bankruptcy Code provides that "the plan must be proposed in good faith" and that "the debtor will be able to make all payments under the plan and to comply with the plan," commonly referred to as "feasibility" 11 U.S.C. § 1325(a)(4) and (6). Because subsection (d) provides Debtor with her only means of re-conversion, the Bankruptcy Court did not err in assessing §§109(e) and 1307(c), which includes feasibility. Case law also suggests that feasibility should be considered for re-conversion, specifically because motions for re-conversion are generally either granted or denied based on a feasibility analysis. <u>See</u> <u>In re Green</u>, 169 B.R. 480 (Bankr. S.D. Ga. 1994). A Chapter 13 debtor, who converted her case to Chapter 7 and then re-converted back to

---

[7] "Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $339,900 and noncontingent, liquidated secured debts of less than $1,010,650 [. . .] may be a debtor under Chapter 13 of this title." 11 § U.S.C. 109(e).

[8] 11 U.S.C. § 1307(c) provides: [e]xcept as provided in subsection (e) of this section, on request of a party interest or the United States trustee and after notice and a hearing, the court may convert a case under this Chapter to a case under Chapter 7 of this title, and may dismiss a case under this Chapter, whichever is in the best interest of creditors and the estate, for cause [. . .]." 11 U.S.C. § 1307(c).

Chapter 13, may not continue under her previously confirmed plan; rather, her new plan must be presented for confirmation, and must meet requirements of 11 U.S.C. § 1325. Id.

Here, the Bankruptcy Court's findings in regard to feasibility were based upon the extensive facts and evidence before it and the testimony presented at the evidentiary hearing on August 14, 2008. The Bankruptcy Court found numerous problems with feasibility, including the fact that Debtor (1) could not account for the $8,000 that she should have possessed in excess income each month, (2) would leave her family with no life expenses if she devoted her entire net income to the plan via a wage order; (3) is completely reliant on her husband's income, and (4) could not show that Mr. Buccolo's income was consistent or stable. Without making any credible arguments in regards to the Bankruptcy Court's feasibility assessment, Debtor cannot satisfy the "clearly erroneous" standard and this claim fails on appeal.

> 4.  Whether the Bankruptcy Court Erred in Finding an Absence of Good Faith from Debtor

Debtor asserts that her ability to make the $6,000 monthly payments ordered by the Bankruptcy Court proved by clear, convincing and objective evidence that she was acting in good faith. To that end, Debtor contends that her reason to convert to Chapter 13 arose from a sincere desire to reconstitute her marriage and preserve the property as the family home, which should further the finding of good faith. Debtor points to evidence in the record, including pay stubs and copies of her and her husband's tax returns. However, Debtor's arguments fall short of proving that the Bankruptcy Court's factual findings were "clearly erroneous."

While there is no precise conduct that qualifies as "bad faith" sufficient to permit a Bankruptcy Court to deny conversion, "[i]t suffices to emphasize that the debtor's

conduct must, in fact, be atypical." Marrama, 546 U.S. at 375, n.11. The Bankruptcy Court focused on Ms. Buccolo's statements under oath that her husband (1) was the cause of her financial troubles, (2) had incurred debts in her name that he failed to pay, (3) had destroyed her credit completely, and (4) had long line of judgments against him which was the reason title to the house was put solely in her maiden name. In so doing, the Bankruptcy Court explained that "[i]t is disingenuous for [Ms. Buccolo] to propose a plan that relies so heavily on the financial ability of her unreliable husband," and further held that "[a] plan that relies so heavily on the man accused of being the cause of her financial downfall has not been proposed in good faith." Buccolo, 397 B.R. at 536. Indeed, Ms. Buccolo's subsequent reliance on her husband for a reconversion to Chapter 13 is disingenuous at the least, but certainly atypical in regards to the good faith analysis. Debtor introduced the idea that she would rely on her husband for the money at the hearing, stating that "[…] they agreed that they would be willing to have a wage garnishment type scenario from J&J and also United Leasing. So that would basically render Ms. Buccolo's paycheck at zero. […] I think [that] the number with Mr. Buccolo then [would] have to be responsible for paying the rest of the other household expenses." Tr. P. 76, ln7-9;19-21. Accordingly, because of the wide discretion given to courts to assess the totality of circumstances when inquiring about the good faith of the debtor, the Bankruptcy Court appropriately assessed Debtor's reliance on her husband. See Myers v. S. Med. Supply Co. (In re Myers), 334 B.R. 136 (E.D. Pa. 2005) (citing In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999)) ("The question of whether a bankruptcy filing was made in bad faith is a fact-intensive inquiry committed to the sound discretion of the bankruptcy court").

Equally damning to the Debtor's argument is that the Bankruptcy Court concluded that Mr. Buccolo's testimony was unreliable since he knew his continued residency was conditioned upon making his mortgage payments, yet he only admitted to submitting seventeen payments since 2003.[9] In fact, the Bankruptcy Court noted evidence of approximately $15,000 in payments from Mr. Buccolo since the bankruptcy case started, whereas the amount should have totaled $60,000 (over the three year period). Similarly, while the July 1st and September 1st payments of $6,000 were timely, both the August and October payments were delinquent and only delivered after the mortgage company's lawyer gave notice to Debtor's lawyer to remit payment. Mr. Buccolo, however, failed to provide any testimony as to the reason why there was insufficient money for the August payment. See Tr. P. 80-109. Mr. and Mrs. Buccolos' testimony along with evidence of payment failure and disingenuous reliance on Debtor's spouse support the Bankruptcy Court's conclusion that the reconversion was not made in good faith.

Mr. Buccolo's pay stubs further support the Bankruptcy Court's conclusions. Mr. Buccolo admitted that his income was seasonal and therefore variable. See Id. at p. 71-73. Courts have often found that the seasonal nature of employment creates an unfeasible plan whereby it cannot maintain its integrity over a few year time period. In re Goodavage, 41 B.R. 742, 746 (Bankr. E.D. Va. 1984). Therefore, from the evidence presented, the Bankruptcy Court's factual findings regarding Mr. Buccolo's income were not "clearly erroneous," and the Bankruptcy Court's corresponding legal conclusions were supported by substantial testimony and other objective evidence.

---

[9] Mr. Buccolo admitted in his testimony that since 2003, he recalled making seventeen mortgage payments. Transcript p. 94.

Finally, Debtor makes a last ditch attempt by asserting that the Bankruptcy Court made an arithmetical miscalculation, pointing out that the $4,800, the amount that the Bankruptcy Court provided as Mr. Buccolo's monthly contribution, was overestimated by $3,565. However, the Bankruptcy Court did not miscalculate the Buccolos' monthly expenses. Without the Chapter 13 plan, their monthly expenses, which include the real estate payment of approximately $1,800, insurance escrow in excess of $1,000, and household expenses of approximately $1,800, totaled around $4,800. Tr. P. 53, ln 4-22. The Bankruptcy Court found that Debtor's net take home pay each month was around $3,565, and would ultimately be put towards the proposed Chapter 13 plan payments of $3,500 per month to the Chapter 13 Trustee. This left approximately $4,800 for Mr. Buccolo to contribute per month. The Bankruptcy Court did not err.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Bankruptcy Court's decision is **AFFIRMED**. An appropriate Order shall follow.

Dated:  July 13, 2009                                        /s/ Freda L. Wolfson
                                                                     Freda L. Wolfson, U.S.D.J.